Estate of Errett Ross Crum, Robert E. Crum and George H. Crum, Co-Executors v. Commissioner.
Estate of Crum v. Commissioner
Docket No. 1669-68.
United States Tax Court
T.C. Memo 1969-187; 1969 Tax Ct. Memo LEXIS 110; 28 T.C.M. (CCH) 946; T.C.M. (RIA) 69187; September 16, 1969, Filed *110 Robert B. Kutz and John R. Griffin, 500 Main St., P.O. Box 3297, Chico, Calif., for the petitioner. Sydney U. Hiken, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency in petitioner's estate tax in the amount of $22,852.72. Petitioner does not contest adjustments to the valuation of certain securities and to the deduction for funeral expenses. We are faced with one issue: Were the decedent's transfers of interest in realty and his relinquishment of indebtedness to his sons and daughters-in-law within three years prior to his death made in contemplation of death within the meaning of section 2035. [1]
Findings of Fact Some of the facts are stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Errett Ross Crum (hereinafter called either Errett or decedent) was born February 6, 1884, and died testate October 12, 1964, at age 80 years and 8 months. His Federal estate tax return was filed November 16, 1965, with the district director of internal revenue, San Francisco, California. *111 Robert E. Crum and George H. Crum are co-executors of the decedent's estate. They were legal residents of Chico and Winters, California, respectively at the time the petition was filed in this proceeding. Errett, born and raised in a Kansas farming community, attended the University of Kansas where he received a master's degree in geology. When he left Kansas in 1914 he was a high school principal, and continued in the teaching profession in California from 1915 to 1919. During the 1916-1919 period Errett and his wife, Grace, had three sons William, George and Robert. The sons subsequently married Hazel, Josephine and Gladys, respectively. George and Robert each had three children. William and Hazel are childless. The sons, their wives and six grandchildren survived the decedent and Grace. Errett owned a financial interest in, and worked as the plant foreman of, a precision instrument firm in Berkeley, California, from 1919 until sometime in 1926. Between 1924 and 1926 Errett and Grace acquired a ranch near Clarksburg, California (hereinafter called the Clarksburg Ranch), and interests in two parcels of real estate near Winters, California (hereinafter called the Home Place and the *112 Brock Place). In 1926 Errett sold his interest in the precision instrument firm, terminated his employment and moved with his wife and three sons to the Home Place. He farmed the Home Place and rented the Brock Place and Clarksburg Ranch. By 1939 Errett and Grace had purchased the entire fee in the Home Place and the Brock Place. After the Brock Place tenants left California in 1942, Errett farmed both the Brock Place and the Home Place. One or two years later he again leased the Brock Place for a term of years ending after the 1946 crop year. From about 1936 until the end of World War II in 1945 he also farmed a 200 acre almond orchard adjoining the Home Place as lessee. Neither Errett nor any member of his family farmed the Clarksburg Ranch at any time. The Clarksburg Ranch was suitable only for row crop farming. William entered the University of California at Berkeley in 1934, graduating in 947 1938 with an ROTC reserve commission as second lieutenant in the United States Army. He entered active duty in the Army infantry as a second lieutenant shortly after graduation. Six months later he received a regular commission as a second lieutenant in the United States Army Air Force, which *113 subsequently became the United States Air Force. He retired from the Air Force in 1964 as a lieutenant colonel. George, in 1936, also entered the University of California at Berkeley, graduating in 1941. During that time he attended the University's agricultural college at Davis, California. After graduating with secondary teaching credentials in agriculture, he taught in high schools in Patterson and Lodi, California. He enlisted in the United States Navy in 1942, completed Officers Candidate School, and was released from active duty in 1946 as a lieutenant. After one more year of high school teaching, he entered a farming partnership with Robert (hereinafter called the partnership). They initially farmed the Brock Place and the Home Place as decedent's lessees under a crop sharing lease. They were, or by 1955 had become, orchardists, and continued as such until after Errett's death. Robert entered the University of California's agricultural college at Davis in 1938, and graduated from the University of California at Berkeley in 1942. Having obtained an ROTC commission as a second lieutenant, he immediately entered active duty in the Army infantry. He transferred to the Army Air Force *114 during World War II, and received his release from active duty in 1946 as captain. He then farmed the Home Place as lessee under a crop sharing lease from Errett as lessor until forming the above-mentioned farming partnership with George. Errett, by the end of the war, had become a successful and knowledgeable farmer who kept abreast of economic and farm trends. Initially he did not encourage his sons to enter farming, and he advised Robert and George that their farming partnership would face difficult problems and would require long, hard work to succeed. Robert and George initially agreed that each would take salaries of $175 per month and would reinvest profits in the farming partnership. They sought to replace Errett's run down and obsolete farm machinery with new mechanized equipment as rapidly as possible between 1947 and 1955. Until 1952 Errett lived with Grace in an old ranch house on the Home Place. They had hoped to build a new house but did not do so. Grace died intestate on May 1, 1952. Her estate was probated in the Superior Court of the State of California in and for the County of Solano at Fairfield, California. The year 1952 marked the beginning of certain changes in *115 the financial or economic relationship of Errett and his family. The devolution by intestacy of Grace's estate was such that immediately following her death Errett became sole owner of the Brock Place and the following undivided fractional interests were held as tenants in common: Property Home Place
Errett
Robert
George
William
Solano County
1/3
2/9
2/9
2/9
Clarksburg Ranch Yolo County
2/3
1/9
1/9
1/9 During the period 1947-1955 George and Robert lived with their families on the Brock Place in a 50-year old ranch house and an old, two bedroom farmhouse, respectively, except that after their mother's death Errett permitted Robert to use his house on the Home Place and Errett moved onto the Brock Place to provide more adequate space for Robert's family. During this time Robert and George lived modestly in order to meet their family and living expenses, and Errett labored to help put their houses on the Brock Place in liveable condition. Robert, George and their father frequently discussed the farming operation. They also corresponded with William on the subject. In 1952 the sons concluded that expansion through further acquisition of land was necessary to increase their earnings. After discussing *116 the problem with their father and brother, both Errett and William verbally agreed to assist financially. George and Robert, with Errett's assistance, began to look for further land. Errett wanted to see Robert and George establish a successful farming operation. After searching for suitable farmland at a price they were willing to pay, George, Robert and Errett decided to purchase the Marshall Place near Chico, California, in 1955. The Marshall Place was a 39-acre almond orchard. Along with William, each acquired an undivided one-fourth interest in May 1955. The purchase price was $53,500, and the seller took a down payment of about 29 percent and a purchase money 948 mortgage for the remainder. The money for the downpayment was raised with a loan secured by a mortgage on the Home Place. Although Errett, George and Robert were liable for the loan, the record does not reflect their respective percentage of liability. The partnership then leased the Marshall Place from Errett and his sons under a crop sharing lease. Errett, as the lessor, received crop sharing rentals from the operation of the Marshall Place until he terminated his interest in 1960. Chico is 105 miles from Winters. *117 It was impractical for one person to farm in both locales at the same time so Robert and his family moved to Chico. George and Robert planned to augment this venture by renting additional land in the Chico area because they felt the Marshall Place was too small to be operated economically. Robert contracted growers in the area, but was not successful in obtaining a lease. As a result of this lack of success, George, Robert and Errett purchased in 1955 a 65-acre almond orchard known as the Rancho Almendra. The purchase price of Rancho Almendra was $63,000, with a downpayment of $33,000. Robert sold his 1/9 interest in the Clarksburg Ranch to William applying the proceeds toward the downpayment for a total outlay of $17,000. George put up $4,000 and Errett paid in $12,000. They took title as tenants in common, holding the following undivided interests: Robert - 17/33, George - 4/33 and Errett - 12/33. They signed a 10-year note secured by a deed of trust for the balance. The partnership also leased the Rancho Almendra from the co-tenants on a crop sharing basis. After this transaction, Errett and his sons owned the following undivided fractional interests as tenants in common: Property
Errett
Robert
George William
Home Place
3/9
2/9
2/9
2/9
Marshall Place
1/4
1/4
1/4
1/4
Rancho Almendra
12/33
17/33
4/33
Clarksburg Ranch
6/9
1/9
2/9
George *118 and Robert viewed the almond orchards near Chico as a long term investment requiring development. They suffered poor almond crops in the years 1955 through 1958 and had not improved their serious cash problem. Errett moved to Chico in 1959 and assisted Robert. Errett had a sister, Martha, who never married. She retired from the teaching profession in 1959. When she became senile and unable to care for herself, Errett became conservator of her estate in 1960, and she moved to his home on the Rancho Almendra. He cared for her there by himself and without household help until her death at age 78 on October 11, 1961. Martha named Robert's daughter as her heir because she was the first girl born into the family since Martha. During the period from 1947 until his first stroke in 1962, Errett normally worked about 10 hours each day, 6 days per week, advising and assisting Robert and George in their farming operations. He performed a variety of difficult tasks including hard physical labor and many requiring knowledge and skill. At his own request he never received a salary. His only remuneration from the partnership's farming operation was his landlord's share of the rentals from which he *119 made his share of the mortgage loan payments on the Home Place, Marshall Place and Rancho Almendra. His income largely came from various investments in farmland, securities and savings accounts. Except for the period in which he cared for Martha, he lived alone from the time of Grace's death until his stroke in 1962. In 1960 Errett loaned George and Josephine a sum of $5,000 or more. He also loaned $1,000 to Robert and $1,000 to the partnership in 1961. Robert and the partnership repaid their loans. In 1960 Errett informed Robert, George and their wives that he intended to make gifts to them. He viewed his daughters-in-law as part of a team involved in their respective husband's farming activities, and he believed that they deserved a reward for enduring the hardships along with their husbands. He felt they should be treated as though they had earned his gifts. During 1960, 1961 and 1962 Errett gave certain undivided fractional interests in the Home Place, Marshall Place, Rancho Almendra and Clarksburg Ranch to his sons and their wives. These gifts, discussed further below, were made by deeds which were duly recorded, and are summarized in the following tabulation: 949 Marshall
Clarksburg
Donee
Home Place
Place
Rancho Almendra
Ranch Gift Dates:
4-22-60
5-2-60
12-28-61
5-17-62
5-17-62
William
1/18
1/24
3/66
2/66
1/9
Hazel
1/18
1/24
3/66
2/66 1/9
George
1/18
1/24
1/66
1/66
1/9
Josephine
1/18
1/24
1/66
1/66
1/9
Robert
1/18
1/24
3/66
2/66
1/9
Gladys 1/18
1/24
3/66
2/66
1/9
Total undivided fractional interest gifted by decedent
1/3
1/4
7/33
5/33
2/3
Value of total undivided fractional interests
$27,291.17
$8,329.33
$12,032.66
$8,582.25
$36,000.00
*120 These properties, except the Clarksburg Ranch, were encumbered by mortgage obligations of the owners at the time of the respective gifts. The donees continued to pay the mortgage obligations. On October 18, 1961, over a year after the 1960 gifts, Robert accompanied Errett to see Robert's attorney, Robert B. Kutz, regarding Errett's conservatorship of Martha's estate (Martha having died a week earlier) and the probate of Grace's estate in 1952. Errett had previously dealt with another attorney, and he met Kutz for the first time on that occasion. About the same time Errett attended a lecture by an insurance salesman on the subject of wills. On October 24, 1961, he returned to Kutz's office and discussed with Kutz his income and properties, family, the laws of intestacy and his testamentary objectives. He told Kutz that he had made previous gifts to his family and intended to make further gifts to them. He stated that he wanted steady income, secure and nonspeculative investments and the financial ability to care for himself during his old age without burdening his children and without relying on them. Errett disliked the feeling of owing money and wanted his properties free of encumbrance. *121 He was unhappy with the net cash return on the encumbered Rancho Almendra and the Clarksburg Ranch. He thought that improvements contemplated on Rancho Almendra by Robert and George would require further cash outlays in which he did not care to participate. At this conference Kutz informed Errett of the need to file a gift tax return for his 1960 gifts which was the first time Errett had been told of this requirement. He instructed Kutz to prepare and file a gift tax return. After Kutz explained how decedent's property would devolve upon his intestate demise, Errett instructed Kutz to draw a will for him. Errett executed a will in Kutz's office on October 30, 1961. The will contained the following dispositive clause: THIRD: I give, devise and bequeath all of my estate of every kind and nature, whether real, personal or mixed, and wheresoever situate, unto a class composed of those of my said sons who shall survive me and the widows and lineal descendants surviving me of those of my said sons who shall have predeceased me, the members of said class to share in my estate, as follows: my estate shall be divided into equal shares, one share for each of my said sons who shall survive me, *122 and one share for each of my said sons who shall have predeceased me leaving a widow and lineal descendants, or a widow or lineal descendants, surviving me; with respect to the share of a son who has predeceased me leaving a widow and lineal descendants, or a lineal descendant surviving me, his share shall be disposed of as follows: in the event such deceased son leaves a widow and lineal descendants (or a lineal descendant), surviving me, then his share shall go one-third (1/3) to his widow and two-thirds (2/3) to such lineal descendants (or such lineal descendant), lineal descendants to take their portion of such share per stirpes, as by right of representation; in the event such deceased son leaves a widow but no lineal descendants surviving me, then his share shall go to the widow; in the event such deceased son leaves lineal descendants (or a lineal descendant), but no widow surviving me, then his share shall go to the lineal descendants (or lineal descendant) surviving me, lineal descendants to take per stirpes, as by right of representation. During a subsequent telephone conversation, Errett instructed Kutz to have an appraisal made of the Rancho Almendra by William H. P. Dolan, *123 Jr. Dolan reported to Kutz on December 18, 1961, that the Rancho Almendra was worth $72,000. By deeds dated 10 days later and recorded January 2, 1962, decedent conveyed 7/33 of 950 Rancho Almendra, which was encumbered, to his sons and their wives. The value of this gift was $12,032.66. On December 14, 1961, Kutz had explained to decedent the annual gift exclusion of $3,000 and the $30,000 lifetime exemption. Decedent then instructed Kutz to structure the 1961 gifts so that there would be no gift tax liability. On December 28, 1961, Errett also made a gift of $5,000 to George and Josephine by relinquishing to them that portion of their indebtedness to him. The gift tax returns for 1960 and 1961, showing no gift tax due, were filed on March 30, 1962. The 1960 return had been delayed because of Errett's lack of awareness of the need to file it and because Kutz encountered difficulty in obtaining certain files from Errett's former attorney. In January 1962, Errett announced his intention to make further gifts to his sons and their wives. Pursuant to his instructions and because Errett wanted them to obtain some business experience, Robert and George engaged G. W. Shaffer to appraise *124 Clarksburg Ranch during early April 1962. Errett did not want to make the gifts until he knew what his gift tax cost would be. He intended his 1962 gifts to be his last inter vivos gifts, and he wanted to make them in such a way that, when completed, all his sons and their wives would have received equal values. Shaffer reported on May 10, 1962, that the Clarksburg Ranch had a fair market value of $54,000. At that time the Clarksburg Ranch was leased to third parties. It had never been farmed by Errett or any of his family. Dolan, by letter dated May 15, 1962, also reaffirmed his December 18, 1961, appraisal of Rancho Almendra. Errett's last gifts of realty to his sons and daughters-in-law were executed by deeds dated May 17, 1962, and recorded June 4, 1962. By these deeds he conveyed his remaining interests in the Rancho Almendra and the Clarksburg Ranch. The gift tax return was filed March 22, 1963. After the gifts on May 17, 1962, Errett no longer owned any interest in the Home Place, Marshall Place, Rancho Almendra and Clarksburg Ranch so that these properties were owned as follows (without regard to the rights of respective spouses in the community property): Property
Robert
Gladys
George
Josephine
William
Hazel
Home Place
5/18
1/18
5/18
1/18
5/18
1/18
Marshall Place
7/24
1/24
7/24
1/24
7/24
1/24
Rancho Almendra
39/66
5/66
10/66
2/66
5/66
5/66
Clarksburg Ranch
1/9
1/9
2/9
1/9
3/9
1/9
*125 The Clarksburg Ranch was sold in February 1963. The values of Errett's gifts by year are as follows: 1960
1961
1962
Home Place and Marshall Place
Cash
Rancho Almendra
Cash
Rancho Almendra
ClarksburgRanch
Total
Robert
$ 5,936.75
$ 2,578.44
$ 1,716.45
$ 6,000
$16,231.64
Gladys
5,936.75
2,578.44
1,716.45
6,000
16,231.64
George
5,936.75
$2,500
859.45
$ 79.57
858.23
6,000
16,234.00
Josephine
5,936.75
2,500
859.45
79.56
858.23
6,000
16,233.99
William
5,936.75
2,578.44
1,716.44
6,000
16,231.63
Hazel 5,936.75
2,578.44
1,716.45
6,000
16,231.64
Total
$35,620.50
$5,000
* $12,032.66
$159.13
* $ 8,582.25
$36,000
$97,394.54
During 1962 Errett made another gift to George and Josephine by relinquishing to them $159.13 of their indebtedness to him. The gifts of undivided fractional interests in realty, set forth in the above gift table, and the relinquishment of the mentioned indebtedness are the only gifts of cash or personal and real property made by Errett during his lifetime for which he filed gift tax returns. Only in 1962 did he incur gift tax on his transfers to his sons and their wives. For 1962 he reported taxable gifts of $15,080.82 and paid a gift tax of $794.17. On April 20, 1962, Errett suffered a *126 cerebral vascular accident, commonly known as a stroke, with partial right hemiplegia, i.e., paralysis. Errett entered Enloe Hospital in Chico on the day of his stroke, and remained there until May 2, 1962, when he was moved to Woodland Memorial Hospital in Woodland, California. On May 16, 1962, George moved him to Templen Rest Home in Winters and in November Errett moved to Alderson's Rest Home in Woodland where he died on October 12, 1964. His death certificate stated the immediate cause of death to be arterio sclerotic cardiovascular disease, encephalopathy. Prior to his death, in April 1964, the Bank of America, NT & SA, petitioned the Superior Court of the State of California in and for the County of Yolo to have Errett declared incompetent and to appoint a guardian of his estate. His three sons consented to the petition filed when Errett was about 80 years of age. Errett was unable to attend the hearing because of physical inability. The court adjudged Errett incompetent by reason of advanced age and ordered the issuance of letters of guardianship. A Chico medical doctor, William Chiapella, first saw Errett on March 1, 1962, and Chiapella performed a phsical examination, obtained *127 a history and caused several laboratory tests to be made. Errett's chief complaint was in regard to difficulty in urinating causing him to awake 4 or 5 times at night. Dr. Chiapella thought that Errett moved slowly and spoke hesitantly, but that he was alert and well oriented, that his general health was reasonably good except for some hypertension and a slightly enlarged prostate. Errett had told Dr. Chiapella that his health had been excellent for years, that he had not seen a doctor for many years, and that he felt he had slowed somewhat mentally. Dr. Chiapella thought that this latter feeling was common in men of Errett's age. He also thought that the hypertension required treatment. He saw Errett again on March 8, 1962, regarding the laboratory tests, and advised Errett to visit a urologist regarding his prostate. Errett declined to do so, and Dr. Chiapella felt there was no urgency although he also thought that Errett would eventually require a prostatecomy which he considered a serious and unpleasant operation but not likely to result in death. He saw Errett again on April 5, 1962, and asked him to return in 3 months to check his blood pressure. At that time Dr. Chiapella thought *128 Errett had a normal life expectancy. Dr. Chiapella next saw Errett when he was admitted to Enloe Hospital on the day of his stroke, April 20, 1962. Dr. Chiapella attended Errett until he left Enloe Hospital on May 2, 1962. At that time, May 2, he thought Errett had improved considerably and was reasonably well oriented. Errett was then ambulatory with a little assistance, and could feed himself. After Errett's stroke, Dr. Chiapella had occasion to correspond with another physician regarding his medical history. In a letter dated May 4, 1962, Dr. Chiapella stated that "he is quite sluggish mentally and yet oriented most of the time," and that he "has improved but cannot walk by himself." The following is a schedule of Errett's adjusted gross income as reported on his income tax returns for 1956 through 1963: 1956
$5,049.37
1957
4,729.03
1958
4,863.02
1959
6,003.21
1960
6,769.96
1961
5,046.84
1962
3,022.80
1963
1,340.70 He claimed long term capital losses in 1956 of $1,000 (carried over from 1955), in 1957 of $1,027.78 (carried over from 1955), in 1961 of $1,000, and in 1962 of $419.17 (carried over from 1961). Errett reported long term capital gain of $2,805.43 in 1959, and deducted one-half in computing *129 his adjusted gross income. For the years 1957 through 1963 he deducted depreciation from gross income in various amounts ranging from $1,459.99 in 1957 to $1,843.01 in 1961, including $1,827.18 in 1960 and $1,794.46 in 1962. The decedent's estate tax return declared a gross estate of $204,549.80 and a gross estate tax of $30,549.87. His 1960, 1961 and 1962 gifts, discussed above, were reflected in the estate tax return as transfers during 952 decedent's life, but were not valued in the gross estate. Included in the gross estate were 68.05 acres of real estate, apparently the Brock Place, valued at $100,500, stocks and bonds valued at $49,616.94, savings accounts totaling $32,263.91 plus cash of $1,643.05. Errett held a $10,000 face amount of insurance and the proceeds plus accumulated dividends of $1,025.90 were paid to his sons as joint beneficiaries. Respondent's notice of estate tax deficiency determined that (a) the relinquishment of the $5,000 debt to George and Josephine and (b) the fractional interests in Rancho Almendra and Clarksburg Ranch which decedent deeded in 1961 and 1962 were transfers in contemplation of death. Respondent increased the gross estate by $74,536. Respondent's *130 request for findings of fact, paragraphs 7, 8 and 16, seek to have included in the gross estate only about $61,615 as the value of the gifts on which the notice of deficiency was based. The following is a chronological summary of the events surrounding Errett's gifts to his children and his death beginning with 1960: Date
Event
1960
Errett Appointed conservator of Martha's estate, she moves into his house
1960
Loan of $5,000 or more to George and Josephine
April 22, 1960
Gift of Home Place
May 2, 1960
Gift of Marshall Place
Oct. 1961
Lecture by insurance salesman regarding wills
Oct. 11, 1961
Martha's death
Oct. 18, 1961
Errett's first meeting with Kutz
Oct. 24, 1961
Errett's second meeting with Kutz
Oct. 30, 1961
Errett's third meeting with Kutz, will executed
Dec. 1961
Appraisal of Rancho Almendra ordered
Dec. 14, 1961
Errett's fourth meeting with Kutz, discussion of gift taxes
Dec. 18, 1961
Appraisal report on Rancho Almendra
Dec. 28, 1961
Gift of 7/33 interest in Rancho Almendra, relinquishment of $5,000 debt to George and Josephine
Jan. 2, 1962
Deeds of Rancho Almendra interest recorded
Jan. 1962
Errett announced intention to make further gifts
March 1, 1962
Errett's first visit to Dr. Chiapella
March 8, 1962
Errett's second visit to Dr. Chiapella
March 30, 1962
Gift tax returns for 1960 and 1961 filed
April 1962
Appraisal of Clarksburg Ranch ordered
April 5, 1962
Errett's third visit to Dr. Chiapella
April 20, 1962
Errett suffered a stroke and entered Enloe Hospital
May 2, 1962
Errett left Enloe Hospital and entered Woodland Memorial Hospital
May 10, 1962
Appraisal report on Clarksburg Ranch
May 15, 1962
Appraisal on Rancho Almendra reaffirmed
May 16, 1962
Errett left Woodland Memorial Hospital and entered Templen Rest Home
May 17, 1962
Date of deeds conveying 5/33 interest in Rancho Almendra and 2/3 interest in Clarksburg Ranch
June 4, 1962
Deeds of May 17, 1962, recorded
Nov. 1962
Errett left Templen Rest Home and entered Alderson's Rest Home
March 22, 1963
Gift tax return for 1962 filed
April 1964
Declaration of Errett's incompetency, and appointment of guardian
Oct. 12, 1964
Errett's death
Nov. 16, 1965
Estate tax return filed
Ultimate *131 Finding Errett Ross Crum did not make the disputed gifts in contemplation of his death. Opinion We must decide whether the decedent's gifts of interests in real estate and the relinquishment of a $5,000 debt to his sons and daughters-in-law for 1961 and 1962 were made in contemplation of death within the meaning of section 2035(a). [2] Section 2035(b) limits the inclusion in the gross estate to the value of gifts made in contemplation of the donor's death within the 3-year period immediately prior to his death. The only dispute herein is whether the gifts in question were "in contemplation of death." There is no dispute as to the value of the gifts at the date of death, which date was elected in the estate tax return. Nor is there any dispute as to whether the gifts were made within the 3-year period. *132 Section 2035 is designed to subject to the estate tax substitutes for testamentary dispositions effected within the applicable period. , . The question of "contemplation of death" is entirely a factual one to be determined from all the surrounding facts and circumstances in each case. It turns, in essence, upon the motive or motives of the deceased donor. If the motives for the gifts appear to arise from thoughts of death or thoughts related to death, the gifts are in contemplation of death. But if it is established that the controlling thoughts or the motives impelling the gifts were associated with lifer with lifetime disires or the concerns of life, the gifts are not in contemplation of death. thus the practical test in each case is whether the decedent's representatives can provide enough evidence of motives associated with life to rebut the statutory presumption that the transfer was made in contemplation of death. Cases involving this issue invariably contain circumstances tending to support both motives. Consequently, in weighing *133 the circumstances present in this case, and in drawing from the mainsprings of human conduct, we have tried to put ourselves in the place of the deceased donor as he lived and worked. We see him as a versatile, able man who ventured into farming in 1926. He was knowledgeable and successful. While pursuing his farming career he fathered three sons, two of whom studied agriculture in college, and after returning home from World War II formed a farming partnership with each other. At first, the decedent did not encourage his sons to undertake farming, but counseled them that they could expect difficult problems and hard work. Robert and George were ambitious and determined to improve the quality of farming the Brock Place and Home Place under crop sharing leases from Errett. Apparently Errett was happy with this decision and sought to assist them. He advised them and worked by their sides, without compensation, from 1947 until his stroke in 1962. The work was often hard and required the knowledge and skill he possessed. He wanted their venture to succeed. Cf . Errett's wife, Grace, died in 1952, before they were able to build *134 a new house on the Home Place. Errett, left with his sons, appreciated the modest circumstances in which the families of Robert and George lived. Shortly after Grace's death, Errett exchanged houses with Robert to permit his family, which included three children, more living space. He also helped both sons improve their houses with his physical labor. When Robert and George requested financial aid to expand their farming activities, Errett and William vowed to help. Errett assisted in the search for further land and he participated in the acquisition of the additional land in 1955 purchasing onefourth of the Marshall Place and 12/33 of the Rancho Almendra. Cf. . The farming partnership then leased both tracts on a crop sharing basis. Errett's prediction of hardships was borne out during the years 1955 through 1958 when the farming partnership suffered poor crops and serious cash shortages. In 1959 he moved to the Rancho Almendra to assist Robert. In 1960, the year in which he began caring for his sister, he loaned George and Josephine about $5,000. 954 During 1960 Errett made his first gifts of interests in real estate, which totaled *135 $35,620.50 in value. He deeded equal interests to each of his sons and each of their wives. He thought Josephine and Gladys deserved a reward for enduring the hardships of the farming venture, but he treated all the donees equally. Cf. ; ; . After his sister's death in October 1961, Errett decided to make further gifts. He was concerned with providing himself with non-speculative investments which produced sufficient income. At that time he was 77 years of age. He was unhappy with the net cash return on the Rancho Almendra and the Clarksburg Ranch, and he disliked the feeling of owing on the Rancho Almendra mortgage. Errett consulted an attorney in October 1961 regarding certain questions which included, among others, his testamentary objectives. He was informed of the need to file a gift tax return for 1960, and he expressed to the attorney his intention of making further gifts. He was later advised of the gift tax exclusions and exemption. Errett then instructed his attorney to take advantage of these provisions to avoid incurring *136 gift tax. On December 28, 1961, following the receipt of the appraisal report on the Rancho Almendra, he deeded to each of his sons and daughters-in-law interests in 7/33 of Rancho Almendra, and he relinquished the $5,000 debt to George and Josephine. George and Josephine received somewhat more than Robert, George and their wives out of the total gift of $17,032.66. Almost immediately thereafter, in January 1962, he announced his intention to make further gifts to these donees. He intended these gifts to be his last while alive and he instructed his sons to secure an appraisal of the Clarksburg Ranch. He intended to equalize the imbalance in gifts per donee arising from the 1961 transfers. But the planned gifts were not made until after he suffered his stroke on April 20, 1962. On May 17, 1962, he gave the same six donees his remaining 5/33 interest in Rancho Almendra, his entire 2/3 interest in the Clarksburg Ranch and he relinquished the indebtedness of George and Joephine in the amount of $159.13. He incurred thereby a total gift tax of only $794.17. He no longer had any pecuniary interest in the Home Place, Marshall Place, Rancho Almendra and Clarksburg Ranch, and he had given *137 each donee almost the same dollar value, exactly as he had planned to do. Cf. . Errett gave away property worth $97,394.54 in the years 1960, 1961 and 1962 which was almost one-third of his gross estate computed at the time of his death. He was 78 years old in 1962, and, insofar as he knew, enjoyed good health until his unexpected stroke on April 20, 1962. Although he had given away a substantial portion of his estate within a few years prior to his death, he retained those assets which would have allowed him to remain financially independent for a long time in view of his history of modest living. We have carefully considered Errett's life and his relationship with his sons and daughters-in-law in an effort to determine by what he was motivated. After all, it is the subjective intention of one now deceased for which the statute requires us to search, and we believe we would be remiss if we failed to view the situation as he probably saw it. Having done so, we are persuaded on this record that Errett was primarily motivated by thoughts associated with life. To be sure, there is no one factor which dominated the rest. But we have seen *138 a segment of his life in which he appears to have been motivated primarily by several lifetime concerns. He clearly was desirous of assisting Robert and George in their farming venture, [3] while at the same time rewarding their wives who were devoted to their husbands' endeavors. Certainly he could have rewarded the wives in his will, but at the time he formulated his gift plans he did not anticipate his 1962 stroke. Obviously he could not have seen them enjoy the gifts had he waited. [4] Nor were they the natural objects of his bounty. [5] *139 And it is clear that he conceived 955 his gift plan long before his stroke and even before he learned of his gift tax obligations. [6] At that time he was healthy and active. And he had not suffered the loss of his sister until after the 1960 gifts were made. [7] These gifts seem to us like logical extensions of his prior generosity in giving his labor, knowledge and experience without compensation. It appears that Errett did not want to show favoritism among his sons and their wives [8] because he went to the trouble of obtaining appraisals for his 1961 and 1962 gifts of realty and instructed his attorney to see that each received about the same value. He may well have been mindful also of William's participation in the purchase of the farms in 1955, and the inclination of Robert and George to consult the family. Even though Errett was a generous father, his gifts were not entirely unselfish. Most of the realty was encumbered and some of it did not produce a satisfactory net cash return. He did not give up anything he actually needed. His desire to rid himself of debt dovetailed with the desire to aid the farming venture *140 which he did by selecting property directly related to that venture. [9] Moreover, he wanted to avoid further outlays for Rancho Almendra which he felt was not an appropriate investment for his needs. Respondent properly urges that we give weight to those circumstances from which death motives may be inferred. We have carefully considered his arguments, but we believe that death motives did not impel the transfers. No doubt Errett had some testamentary concerns. He was passing his mid-seventies, and he knew his sister and parents had died at about the same age. But, as we have previously indicated, he was active, healthy and without reason of his own knowledge [10] to anticipate more than the general expectancy of death common to all of us. See section 20.2035-1 (c), Estate Tax Regs.; His medical complaint in March 1962 was not serious and was unrelated to either his almost completed gift program or to the cause of his death. Errett executed his will in October 1961 just before making the gifts. Normally this factor would weigh in respondent's favor, but we think *141 the circumstances of this case require that it be discounted. The dispositive scheme of the will favored equal division of Errett's estate among his sons, the same division which was contemplated by his life insurance. If a son failed to survive Errett, the son's wife and lineal descendant or descendants would inherit the son's share on a respective onethird and two-thirds basis if they survived him and Errett. A son's widow would inherit all her deceased husband's share only if there were no lineal descendants also surviving him. This dispositive scheme offered Errett's daughters-in-law only a highly contingent possibility of a share in his wealth whereas the outright gift was a present gift, a certainty, based on Errett's regard for his family which he was able to articulate during his lifetime. Furthermore, we have no indication that Errett was concerned with death taxes, estate liquidity or other matters related to the post-death management of his estate. We know that he wanted to avoid gift tax, which would require present cash outlay, and that he managed to accomplish his gift program at a relatively nominal gift tax cost. Respondent points to Errett's "pathetic" medical condition *142 following his 1962 stroke. Since the intention to make the 1962 gifts arose 2 months prior to his first visit to Dr. Chiapella and over 3 months prior to the stroke, we regard his condition after the stroke as relatively insignificant. Nor do we think that it matters when Errett first became afflicted with the disease which caused his death because he was unaware of the disease when he made the gifts. While, as in other cases of this type, the result is not always entirely free from doubt, we think there is present herein a coalescence of factors - the establishment of a limited and fixed gift plan, a history of business and financial assistance to members of the decedent's family, the equality of treatment and the selection of 956 the subjects of the gifts, and a gift plan incompatible with his testamentary plan - that shows motives associated with life sufficient to overturn the statutory presumption which exists in favor of respondent, and carries petitioner's burden of proof. To reflect this conclusion and to provide for the uncontested adjustments, Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
*. Value of gift reported in gift tax return.↩
2. SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) General Rule. - The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.↩
3. See , where an elderly donor sought to protect his son from the son's own business misadventures by creating a trust. ↩
4. Cf. (D.C.S.D. Fla., 1964).↩
5. Cf. . 6. Cf. ; ; , reversed on another issue, .↩
7. Cf. ; ↩
8. Cf. (C.A. 3, 1963), where the donor, age 70, gave several insurance policies equally to his three daughters. ↩
9. Cf. ↩
10. Cf. .↩